# Third District Court of Appeal
## State of Florida

Opinion filed January 4, 2023.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D21-1706 & 3D21-1731
Lower Tribunal No. 18-23952
_____

**7 at Blue Lagoon (1), LLC, et al.,**
Appellants,

vs.

**Blue Lagoon Condominium Association, Inc.,**
Appellee.

Appeals from the Circuit Court for Miami-Dade County, Jose M. Rodriguez, Judge.

GrayRobinson, P.A., and Frank A. Shepherd and Sydney M. Feldman; Weissman & Dervishi, P.A., and Brian S. Dervishi, John Borgo, Peter A. Tappert and Sergio E. Molina, for appellants.

Law Office of Lazaro Vazquez, P.A., and Lazaro Vazquez, for appellee.

Before FERNANDEZ, C.J., and LINDSEY, and LOBREE, JJ.

LINDSEY, J.

Appellants (collectively, "Weiss")[1] are involved in developing property near the Miami International Airport. A non-exclusive Easement runs across the Weiss Property and provides the adjacent property, Appellee Blue Lagoon Condominium Association (the "Association"), access to a public street. Weiss seeks review of a Final Judgment interpreting a 1997 Agreed Permanent Injunction enforcing the Easement. The trial court interpreted the Injunction to preclude Weiss's proposed development because it would "interfere" with the Association's easement rights by increasing traffic. Because this interpretation overlooks the contextually appropriate, ordinary meaning of the Injunction, we reverse.

## I.    BACKGROUND

The underlying dispute involves a non-exclusive Easement and two adjacent properties—the Blue Lagoon Condominium Association Property and the Weiss Property. Below is an image showing the Easement and the two properties.

---

[1] Caroline Weiss owns the undeveloped property through two LLCs: 7 At Blue Lagoon (1) and 7 At Blue Lagoon (2), all of which are Appellants. Co-Appellant (intervenor below) TIG Romspen US Master Mortgage, LP, which has filed a separate initial brief, holds a mortgage on the property owned by the Weiss LLCs.

2



As shown in the image, the only way the Blue Lagoon Condominium Association (the dominant estate) can access NW 7th Street is by using the non-exclusive Easement (Blue Lagoon Drive) on the Weiss Property (the servient estate). The Easement was created in 1986, before the Blue Lagoon Condominium had been built, as a condition of a bank loan, and provides, in pertinent part, as follows:

> GRANTOR[2] DOES HEREBY grant . . . a temporary, nonexclusive easement for the purpose of pedestrian and vehicular ingress and egress and for installation and

---

[2] The Grantor was Intercontinental Investment Bankers, Inc., a company controlled by Weiss. The Grantee was Florida National Bank.

maintenance of public utilities, whether underground, surface level or above surface level, and for all other lawful purposes, in and upon, over, across, under and above a 40 foot strip of land lying within [the Weiss Property] . . . .

The Easement further provides that if the Grantor defaults, the Easement becomes permanent. The Grantor defaulted in April 1993, the bank foreclosed, and the dominant estate was sold to the Blue Lagoon Airport Club Apartments (the "Airport Club"), the Association's predecessor.

In January 1997, the Airport Club sought injunctive relief against Ms. Weiss, who had dumped piles of soil and rocks on the Easement to prevent access to and development of the Airport Club Property (the "Injunction Action"). The trial court granted a temporary injunction in favor of the Airport Club, finding that Ms. Weiss had impermissibly obstructed access to the Easement:

> On or about Saturday morning, December 21, 1996, [the Airport Club] hired several trucks to commence the delivery of fill materials to the [Airport Club] property. The only means of ingress and egress to the property is by virtue of the Easement granted by [Weiss]. The [Airport Club was] obstructed from obtaining access to the Easement.

The court enjoined Weiss "from interfering with [the Airport Club's] right of ingress and egress to and from the property . . . ." Further, the court authorized the Airport Club "to take appropriate steps to obtain access

4

including but not limited to, removing fences, structures and obstacles in order to gain access to the property."

The Airport Club and Ms. Weiss eventually agreed to a final judgment entering an Agreed Permanent Injunction, which granted the same relief as the temporary injunction:

> The [Weiss] Defendants . . . are hereby enjoined and prohibited from interfering with [the Airport Club's] right of ingress and egress to and from the property set forth on Exhibit A attached to the Declaration of Easement which is the subject matter of this action. The [Airport Club] shall be entitled to take all appropriate steps to obtain access including, but not limited to removing any obstructions, fences, structures and obstacles in order to gain access to their property.

In 2005, the Association took the Airport Club's place as the owner of the dominant estate. In 2017, Weiss made plans to build a condominium complex. Weiss applied to the Miami Planning Department to increase the number of stories she was permitted to build (though density remained the same). Following several hearings, the Planning, Zoning, and Appeals Board and the Miami City Commission approved Weiss's application.[3]

In July 2018, the Association brought the underlying action against Weiss seeking declaratory relief as to the rights and obligations of the parties

---

[3] The issue of traffic was raised at the hearings, but it was not formally considered at this stage in the development process, which had to do with rezoning. Below, the Assistant Director of Planning testified that a traffic study will be required for later development stages.

5

under both the Easement and the Agreed Permanent Injunction. In its Complaint, the Association alleges that the increased traffic resulting from development of the Weiss Property would violate its rights under the Easement and the Agreed Permanent Injunction.

In June 2020, the trial court granted partial summary judgment in favor of Weiss, concluding as a matter of law that Weiss's development plans "do not violate the plain terms of the easement, which preclude [Weiss] from placing any structure or improvement of any kind in or upon or over the 40-foot easement area. The updated plans would leave the easement area unobstructed and the Association would have access to it." Although the Agreed Permanent Injunction enforces the terms of the Easement, the trial court declined to grant summary judgment with respect to the Injunction, finding "a genuine issue of material fact as to whether the traffic caused by updated plans would interfere with the Association's right of ingress and egress to and from the Association's property." The Association has not cross-appealed this order.

Following a bench trial on the interpretation of the Agreed Permanent Injunction, the trial court granted final judgment in favor the Association. The court focused on the word "interfering" in the Injunction: "The [Weiss] Defendants . . . are hereby enjoined and prohibited from *interfering* with [the

6

Airport Club's] right of ingress and egress to and from the property set forth on Exhibit A attached to the Declaration of Easement which is the subject matter of this action." (Emphasis added). The court observed that "interfering" was not defined in the Injunction and therefore relied on a broad definition in Black's Law Dictionary, which, according to the trial court's order, "defines 'interference' as 'the act or process of obstructing normal operations' or secondarily, as 'an obstruction or hindrance.'" The court concluded that under this definition, "[c]ausing significant traffic delays constitutes interference . . . ."

Weiss timely appealed.

## II. ANALYSIS

This appeal presents us with a pure legal issue of textual interpretation, which we review de novo. See, e.g., Dezer Intracoastal Mall, LLC v. Seahorse Grill, LLC, 277 So. 3d 187, 190 (Fla. 3d DCA 2019) .

Weiss and Co-Appellant Romspen contend that the trial court erred in focusing exclusively on a dictionary definition of the term "interfering" instead of considering the context of the Agreed Permanent Injunction as a whole. We agree.

In their seminal work on textual interpretation, Scalia and Garner caution against a common pitfall when using dictionary definitions: "Because

7

common words typically have more than one meaning, you must use the context in which a given word appears to determine its aptest, most likely sense." Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 418 (Thomson/West 2012). Further, in introducing contextual canons of interpretation, Scalia and Garner explain that "[p]erhaps no interpretive fault is more common than the failure to follow the whole-text cannon, which calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts." Id. at 167.

While it is true that a broad definition of "interfering" can be found in Black's Law Dictionary, among several definitions, and this definition could, in isolation, support the Association's position that interference means delaying or slowing down ingress and egress, this definition is not supported by the Easement, which the Permanent Agreed Injunction enforces, or by the entire text of the Agreed Permanent Injunction itself.[4] It is a fundamental principle of textual interpretation "(and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn

---

[4] The first entry in Black's Law Dictionary defines "interference" as "[t]he act or process of obstructing normal operations . . . ." This definition is fully consistent with the trial court's determination in 1997 that the Easement prohibits obstructing access.

from the context in which it is used." Advisory Opinion to Governor re Implementation of Amendment 4, The Voting Restoration Amendment, 288 So. 3d 1070, 1079 (Fla. 2020) (quoting Textron Lycoming Reciprocating Engine Div., Avco Corp. v. United Auto., Aerospace, Agric. Implement Workers of Am., Int'l Union, 523 U.S. 653, 657 (1998)).

It is undisputed the Agreed Permanent Injunction interprets and enforces the Easement.[5] The Injunction explicitly references and includes the Easement as an attachment. Specifically, the Injunction prohibits Weiss from interfering with "ingress and egress to and from the property set forth on Exhibit A attached to the Declaration of Easement[.]" Further, the Injunction clearly identifies the Easement as "the subject matter of this action."

In the 1997 Injunction Action and more recently in the underlying action, two separate trial courts correctly concluded that the Easement prohibits obstructing access to the dominant estate. Indeed, the trial court here, in its partial summary judgment order, concluded that the terms of the Easement did not prohibit development plans that would result in increased traffic. And this legal conclusion has not been challenged on appeal.

---

[5] In its Answer Brief, the Association recognizes that the injunction "interprets the easement . . . ." Answer Br. at 35.

Because the Agreed Permanent Injunction enforces the Easement, it must be interpreted in that context.  See Saucer v. Efstathion, 34 So. 2d 435, 436 (Fla. 1948) ("[J]udgments and decrees are to be construed with reference to the subject matter before the Court pronouncing them.").  Consequently, the Agreed Permanent Injunction enforcing the Easement should be given the same interpretation as the Easement itself, unless there is evidence to suggest otherwise.[6]

Moreover, the facts surrounding entry of the Agreed Permanent Injunction and the entire text of the Injunction do not support the trial court's broad definition of "interference."  The Injunction Action arose because Weiss had physically obstructed access to the Easement, not because Weiss had done anything to delay or slow down ingress and egress.  Obstructing the Easement with piles of dirt and rocks was a clear violation of the terms of the Easement.  Since the Agreed Permanent Injunction arose in the context of physical obstructions to access, its terms should be interpreted with this in mind.  See Boynton v. Canal Auth., 311 So. 2d 412, 415 (Fla. 1st

---

[6] The Association argues that Weiss agreed to broader restrictions in the Agreed Permanent Injunction but points to no evidence, apart from the use of the term "interference," in support.  See Scalia & Garner, supra, at 70 ("Most common English words have a number of dictionary definitions . . . . [O]ne should assume the contextually appropriate ordinary meaning unless there is reason to think otherwise.").

DCA 1975) ("A judgment should be construed with reference to the issues raised in the case and which are intended to be decided, and the scope of the judgment is not to be extended beyond the issues raised in the case, or the state of facts and situation of the parties existing at the time of the action.").

Turning to the text of the Agreed Permanent Injunction, it is clear it enjoins the same obstructions to access prohibited by the Easement and that led to the Injunction Action. For instance, the Injunction authorizes the dominant estate to remove physical obstructions by taking "all appropriate steps to obtain access including, but not limited to removing any obstructions, fences, structures and obstacles in order to gain access to their property."

Given this context, the best interpretation of the term "interfering" is not simply anything that hinders, but rather some form of obstruction to access. Here, there is no alleged obstruction to access. Thus, we need not consider the court's factual findings regarding increased traffic. The Injunction plainly does not deal with traffic delays, and the issue of traffic will more properly be addressed at later stages in the development process.

III.    CONCLUSION

11

The context of the Agreed Permanent Injunction controls its interpretation. Accordingly, we conclude that the trial court erred in interpreting the term "interference" in isolation to refer to traffic delays, as opposed to obstructions to access. We therefore reverse the Final Judgment and remand with instructions, consistent with the trial court's interpretation of the Easement itself, to enter judgment in favor of the Appellants.

Reversed and remanded.